May it please the Court, Alan Runyon on behalf of Objectors Robert May, Sharp, Tucker and Worthington Farms. Your Honors, this case is really about one core issue that permeates the entire process and that is the issue of adequacy of representation. The inclusion of the Lewis Certified class in the Speaks Settlement class created inherent interclass conflicts of interest. In fact, it should not have been certified as it is. Speaks representatives and Speaks counsel could not adequately represent these differing interests in the Lewis class. As a consequence, the negotiated settlement, which included the Lewis class interest, is not fair, reasonable, nor is it adequate. In addition to that, the failure of the district court to either allow an opt-out, admittedly under very unusual circumstances for such an event, or to allow the intervention by Lewis, deprived the process of a solution. We're here because we have- Why did they not seek to intervene earlier? Why wait until two days after the settlement? They waited until they knew the terms, Your Honor. We asked for the terms. They asked for the terms. They knew the settlement was going forward. They had asked the question in April, I think, of 2017, whether it would include these matters. In fact, took the position that it shouldn't include these matters in the Lewis case. And the response was that the plaintiffs didn't intend to represent the interest of a class action. And thereafter, when it was put on the record that it was compromised, the question was asked twice by Mr. Cherry, co-counsel for the plaintiffs, about what the terms were. And the terms were promised to be disclosed within 30 days. They weren't. And they filed the action within a few days when the terms were disclosed. Is it your position that you weren't aware of any problems until you knew the terms as to the adequacy of the representation, of representing the class, that that was the only notice you would have as to once you saw the terms? We knew the potential for a problem, Your Honor. We knew because if they intended to include the class, the Lewis class, in that process, then that would create a problem because they were unrepresented. Why isn't the potential for a problem enough? Because we didn't know what the outcome would be. They could have had a fair settlement. That's why you would intervene. Well, we intervene when we know there's a problem, Your Honor. The Third Circuit says you don't have to intervene until the end of the... Well, we're not in the Third Circuit. What about our case in Scott v. Bond? I'm not familiar with that, Your Honor. Oh, okay. I'm sorry. But you must... You'd have to agree, though, when we make inquiries as to the adequacy of the representation in terms of similar interests and whether or not they're in conflict, we have to do that in the context of not knowing what the end's going to be as to the settlement, right? I mean, you were aware because of the state litigation. You knew that there was some questions, right, in terms of being able to protect your clients in that class. That's why the letter was written, Your Honor. That's why the letter was written, calling into question the adequacy of that attorney to settle the interests of the class when the North Carolina Supreme Court had already found adequate class counsel and adequate class representatives. And the answer we got back was, at best, ambiguous. But it clearly said, we don't intend to represent the interests of the class. And, in fact, in the position before this court right now, they've taken the position the interests weren't represented. They were just precluded. Isn't that the typical way, situation you have with parallel class actions, that you can have overlap and the one that reaches final judgment doesn't necessarily, isn't acting on behalf of a separate class, but the race judicata effects could impact others. That's a fairly normal situation in parallel class litigation. What I'm trying to figure out is, to me, it looks like your normal situation with the only things that are really distinctive are a state court certification order that is appealed to the Supreme Court. That doesn't always happen. So I'd like you to ask how that changes the fact that that's still not a final order. And then the issues of misconduct that are part of this case and whether they create some legal thing. But to me, those are the only two things that I see that are different than a normal parallel class action. And I'd like you to address those two points. There's no question that there are, all the time, parallel class actions overlapping interests in both those class actions. The touchstone of all this is the class action that gets to the process of being resolved first has to adequately represent all of the interest involved in that settlement or that judgment or whatever it happens to be. That is not present here. That's an abuse of discretion standard and we have a judge who, you know, I appreciate the disagreement with his decision, but appears to have addressed all the factors the law requires and wrestled with this and come to a conclusion. And it's a pretty tough row to hoe with an abuse of discretion standard. There's no question that standing here in the face of an 80 plus page order arguing abuse of discretion, it's an uphill battle on that issue. But Your Honor, there are some issues, Judge Quattlebaum, that come right to the surface on the issue of adequacy and here's what they are. The question is, in the broader context, do the interests of the Lewis class need different representation? That's the core question. And the answer to that is, and I'm going to refer occasionally to the Amchem products case, United States Supreme Court 521 U.S. 591, because I think that case shed some light on the context of where this case is. That was an asbestos exposure class action brought for the entire world, essentially. Within an exposure class was an injury class. The injury class had the class rep, the exposure class had none. And so the issue was, was this certifiable? And what the Supreme Court of the United States focused on, and what's important to focus on here, is that in the process of the rush to settlement of an action in which the issues have never been joined, there has never been adversarial discovery, the district court overlooked, not because he's incapable, but because of the process that led him there, with a settlement in hand, without an adversarial process to cause him to look at the underlying certification issues. And here's what the U.S. Supreme Court says. The settlement class does not lessen the certification requirements. In fact, it demands undiluted, even heightened attention in the settlement context, on page 620. And the Supreme Court went on to focus on the fact that you have this huge class of people, much akin to the membership class that we have here, without injury I would contend, versus the Lewis class, which is a subset, but it's the only viable certifiable subset, because it includes patronage interests, which are the only kind of interests, the statutes in North Carolina, allow a patron to have and claim injury for. The U.S. Supreme Court said the representative must be part of the class, possess the same interest, and suffer the same injury. None of those apply here. A patronage, those with patronage interests are members, but all members don't have patronage interests. So by bringing in the Lewis class, without representatives, without counsel, without class representatives found to be adequate, the court built in a situation where the existing class was represented by members, whose only requirement for representation was that they represent members. And that's a damage, the Amchem case involved, like you indicated, class members who had experienced injury and class members who had been exposed and might potentially experience injury in the future. Here the claims, while I appreciate the difference of the patronage situation, you have all the patrons who claim that this co-op is retaining money that it should not retain and should be distributed. Now the patronage plaintiffs may have a claim that their damages should be more and that maybe the others shouldn't exist, but they all relate, don't they, to the basic claim that this co-op is retaining money and it needs to be distributed in some fashion. No, but for this reason. Members have no interest in the co-op unless there's a patronage gain that follows their product. So the argument is that as a matter of law, the non-patronage members could not recover anything and so it's a legal matter? Is that the argument? That is the argument. And it's based on North Carolina statutes, the co-op's business practice, the statement of the co-op's state court counsel who worked on this case. And I'll just start with the very outset of the issue. The district court said there was no evidence in support of the ball proposition concerning patronage interest. Well there certainly isn't much in the speech, but Lewis is filled with it. The Supreme Court of North Carolina defined it as a patronage-based class at page 708. The North Carolina statutes provide that you can only, your interest is based on your patronage. And the best one, the one right on point, 54-126, net earnings or losses shall be apportioned among the members in accordance with the ratio of each member's patronage during the period involved bears to the total patronage of all members during the period. To be allocated annually, section 126, and the corporation can make no profits for itself, it makes it for its members as producers. As Don Tucker, counsel for the state court, the cooperative in the state court said when they settled this case, proposed a settlement of $78 million in 2005, he said any interest is determined by each member's patronage and more importantly whether that patronage resulted in profits. Then he asked the rhetorical question, suppose someone stopped farming before 1985, didn't sell their crops at a profit, didn't put assets into the reserves of stabilization, why are the allocations being made to the 90,000? The answer is because the assets were generated from the business of those 90,000. That concept, the district court confused, maybe because it hadn't been exposed to cooperative processes, maybe because of the rush of this process to settle it, maybe because of the lack of the adversary proceeding, whatever the reason was, the district court said the co-op purchased tobacco, well the co-op got consigned tobacco on behalf of a member. The co-op lost money on the sale of its tobacco, well it wasn't its tobacco, co-op can only act for members. It's the agent. How long did the interveners know about the Speaks class action? Since it was filed in 2012. Alright, so Scott versus Bond, opposing counsel actually cited in their brief, so I'm surprised that you're not familiar with it. It's a 2018, although unpublished, Fourth Circuit case that says interveners that filed after the settlement or shortly after the settlement filed too late when they were on notice the entire time about this related class action. So maybe you could distinguish that. What were we on notice of? We were on notice that a case was filed in federal court, then stayed for five years waiting for this case, the Lewis case. Well at least within 30 days of the, you were on notice that they had reached a settlement but were about to reach a settlement. Let's go back then to the 30 days you said you waited. We knew from sometime in May 2017 that they were going to have a settlement conference which prompted the letter that said if you're going to try and settle the scope that you have in your class action, you can't do it without the proper representatives. Which prompted the letter that said we're not going to settle any class of interest. Which prompted the resolution without disclosure, the filing with the federal state court said we've solved it but no terms. Which prompted two emails that said what are the terms and 60 days later the terms were filed and we filed an intervention motion within a week. But the district, aside from the intervention which has been asked about, all those facts that you just articulated are considered by the district court judge and he just viewed them differently than Errol's argument, isn't that basically what happens? I mean obviously that's why you're here, I don't mean to state the obvious but in an abuse of discretion situation, that's what I'm trying to get at. I understand you have a different view of the effect of those emails and who was obligated to provide more information or less but the district court gave those consideration it seems to me. Judge Quattlebaum, there's no question that he did. The question here is in spite of all that, should this case have been certified without a subclass, without representatives to represent these differing interests? They're clearly differing, in fact I would argue that the speaks class in the absence of Lewis is not a class at all. It's a members with no injury. It's not a question of damages, it's a question of the lack of an injury. Under the statute, if they didn't have an interest represented by their patronage interests then being a member, they've got no loss. And then in addition, your honor, and I think I have to wait. Thank you. Shipman. May it please the court, my name is Gary Shipman, together with my colleagues, we represent 30,000 current or former members of this agricultural cooperative, none of whom have any greater entitlement to the accumulated equity of this cooperative than anyone else. All of whom have not objected, who have made claims and are awaiting payment. For the second time in approximately a dozen years, counsel for the objectors has attempted to interrupt a settlement based upon, as Judge Dever noted, nothing more than hope. Despite contending for more than a dozen years that this agricultural cooperative had accumulated excessive reserves, when it came time, as Judge Dever noted, for the rubber to meet the road, they couldn't tell the court what they thought was a reasonable reserve, nor could they provide any factual or legal support that class members could ever get more through litigation than what they would get through settlement. What's your argument about the position that you must have subclasses, that the patronage issue is, as a matter of law, the only people or the only class members who can recover, and therefore there has to be, as a matter of law, subclasses or it can't be certified? I have three responses to that, sir. First, that argument was never advanced to Judge Dever. The first time we heard about subclasses was in the briefing to this court. Next, these arguments fail to understand that this accumulated equity is not as the result of patronage activity. They make the argument that agricultural cooperatives are required to distribute profits. Well, these weren't profits. These accumulated monies were solely as the result of two acts of Congress that ceded tobacco that was under loan with CCC to these cooperatives. This whole idea and notion that their class is a patronage class, when their class definition, Judge Quattlebaum, is the same as the class definition here. When we get into this discussion of conflicts, it was when objectors council revealed for the first time during this settlement process that there were certain members of their own defined class that under their theory would never recover anything versus our position supported factually and legally that no member, regardless of when they did or did not patronize this cooperative, had any right to any of these accumulated equity. A fact that Judge Dever found, a fact that two state courts in Rigby found. The state court here in this case actually found collusion and violations of the North Carolina rules of professional conduct. What are we supposed to ignore that? Your Honor, just as Judge Dever was not required to give any deference to that finding, a finding that was made, as Judge Dever noted, without the benefit of thousands of pages of a record that he had before him that the state court judge admitted he did not have before him. Was there information the state court had that the district court didn't have? No ma'am, absolutely, positively not. Most importantly, they didn't have the benefit of hearing from me. We were never provided notice of any kind of hearing where any idea that... Are the Fisher-Lewis plaintiffs better off under the Speaks settlement? Do they get more money under the Speaks settlement than they would have under the Fisher-Lewis settlement? Yes ma'am, absolutely. How is that? Because the Fisher-Lewis, there was no settlement in Fisher-Lewis. They would have to litigate their case to final judgment and to prove that under the law of agricultural cooperatives generally, and this cooperative specifically, that any of the Fisher-Lewis plaintiffs were entitled to recover any of those monies. Something that when Judge Dever asked to provide authority for that, they couldn't do it. Their own expert had not even attempted to calculate what it was that was excessive about the reserves that had been accumulated. Was there an opt-out provision that if they wanted to do that, they had the right to pursue it as individual plaintiffs? Yes sir, there was an opt-out provision in the Speaks case, and there were a minimal number of opt-outs where if they wanted to pursue their claims that individually they had a right to any of the accumulated reserves. They absolutely could do that. Back to Judge Thacker's question concerning the order with the violations that the North Carolina court considered there. In looking through the law on that, as I've seen it, I haven't seen anything in the class in the Fourth Circuit case, but around the country it appears that that's something a in terms of the adequacy of counsel, but does not make counsel inadequate as an automatic matter. It depends on the circumstances and whether the class members have noticed is the best I can do to synthesize that law. And I think that's a fair summary, Judge Quattlebaum, and one thing that I want to make clear. Well, I'd like for you to explain why the bases of those allegations in this case are on professional responsibility allegations do not constitute things that we should consider. Well, first, the record doesn't support their truth. First, there were not unauthorized communications by counsel for the cooperative. Did the district court have the opportunity to consider all that? Yes, ma'am. They absolutely did. Where is that? It's in the record in terms of, because of course we were not appointed as class counsel until this case received preliminary approval. So we never attempted to act as counsel for any class until such time as we were appointed. So when you say it's in the record, where in the record? Your Honor, I believe that the discussion about the findings or the concerns from Judge Shirley were in the record in terms of the hearing on final approval and questions back and forth. Is that something that the district court would have to go root around and find? No, ma'am. I thought your questions were... Where in the record that the district court considered the violations of the rules of professional conduct as found by North Carolina? When the questions were asked by Judge Dever to counsel for the objectors, do you contend that I am bound by the findings by Judge Shirley because that's what they were talking about, the Rule 23c order that Judge Shirley entered? And when he pressed counsel for the objectors and counsel for the objectors says, yes, we believe that you're bound, Judge Dever said, give me some authority for that because I don't find any. So the order was in the record, Judge Thacker. The Rule 23.1 state court order was in the record. There was a discussion on the record by Judge Dever. Didn't the order, I think around page 65, 66, 67, talks about the order, talks about how that's not binding on him, talks about the collusion allegation. I don't think he specifically mentioned the ethical claims. So you agree with that? They aren't mentioned. He appears to be talking about the order but not going into as much detail as the appellants have done. I totally agree with that. That doesn't mean he did not consider them but I will contour that there is no express discussion about them. He does talk about the long form notice issue and the conclusion issue explicitly, correct? Yes, sir, absolutely. He deals with all of those. And was the mediator aware of the violations as found by North Carolina? The mediation was conducted prior to the time of Judge Shirley's order and it was concluded there was a term sheet that was reached but then it took several months. So the mediator was not aware of that? No, ma'am. I'll be happy to answer any questions you've got, otherwise I'll have a seat in the council for the quorum. Thank you, Chief Judge Gregory. May it please the court. Your Honors, I would like to say at the outset, Derek Schaefer for the U.S. Tobacco Cooperative. As of today, we have a thoroughgoing nationwide notice program that has yielded submissions of tens of thousands of claims from class members. That $24 million settlement has overwhelming support from class members because it is, we respectfully submit, overwhelmingly good for class members. That's the bottom line that led Chief Judge Dever to finally approve the settlement as your Honors have noted in more than 80 pages in granting approval. That order, Your Honors, as thoroughgoing as it is, followed comprehensive, rigorous review in which Chief Judge Dever heard from everyone and invited still further input. There were invitations for live testimony, further evidence, whatever folks wanted to do as of the final fairness hearing and Judge Thacker. Judge Shirley's state court order, the Rule 23 order, was very much before Chief Judge Dever at that time. I thought about it in light of what was the, in 2005, there was a subset of the speaks class and was there a settlement for like $70 some million? There was, Your Honor, a settlement, a proposal that went in at that time, and Chief Judge Dever explicitly addressed those prior settlement offers as well, and that, Your Honor, was a function of the circumstances at the time. It was not really driven by the merits. It was kind of a political compromise that the cooperative is willing to do. There were declarations and findings by Chief Judge Dever on that point. In addition, Your Honor, it was a very different era for the cooperative. That was just the end of federal price support, and it was reinventing itself, figuring out how is it going to make a going in this international marketplace, and the answer that came up with Chief Judge Gregory was by becoming vertically integrated, the way modern, successful cooperatives do. So it had to spend that money to invest in facilities, to invest in production, to invest in its own tobacco lines. Yeah, but it seemed like the district court was more persuaded by its analysis of Rigsby, wasn't it, in terms of then what you had laid out. I think the Lewis class had some victories. They beat back the cooperative and had victories, so that would indicate muscle to their merit, wouldn't it? Your Honor, I think not on the merits. Unlike the facts in Rigsby. There was no flexing the muscles with respect, Your Honor, on the merits. There was only one decision as to the derivative of the plain defense. You had a motion to dismiss, didn't you? Your Honor, and you lost. If you read the terms of the dismissal orders, they said, these are serious questions that are better decided on summary judgment, and they never got to summary judgment. And the core merits issue, respectfully, is simply, is there any excess in the cooperatives reserve? If so, how much? And are class members entitled to that? That is, as you see from Chief Judge Devers' order, and has been conceded, there's not a penny of damages that plaintiffs or their expert had even identified as viable. But I think Your Honor's correct. There's also the learning from Rigsby, but there's also the development of a record that shows just how well the cooperative has been using its reserve, and just how essential that reserve is. So if you look in Chief Judge Devers' order 4760 and 61, and 4768 and 69, you'll see how he analyzed those prior settlement offers. But my point, Your Honor, is everything that Mr. Runyon wants to say here today, that was all fair game for him to argue to Chief Judge Devers, and Chief Judge Devers was digesting it all. So they've identified, we respectfully submit, no way in which Chief Judge Devers abused his discretion by looking at these arguments. And I would just note for Your Honors that the arguments have, shall we say, evolved at different stages of this case, as they come from objectors in the intervener. And if you look at their opening brief, pages one and two, and page 22, you'll see their statement of the issues. You'll see the summary of the argument. That's very discreet, and those questions, Your Honor, I think are overwhelmingly answered in favor of affirmance, and cleanly so. And I want to return, Judge Thacker, if I may, to your questions about the timing of the intervention from Mr. Lewis. And I would just note, what the record shows is that there was an April 20th heads up, specifically Mr. Runyon and his colleagues, that the mediation would be happening, that there's this effort to settle the Speaks case. That's at Joint Appendix 4583. You can see in Joint Appendix 734 and 35, in late June, how we explicitly address concerns that came from Mr. Runyon and his colleagues, and said, there will be preclusive effect. The Speaks settlement will have preclusive effect, make no mistake, on Fisher-Lewis. So that's as of June. And in Scott, Judge Thacker, you may recall, the intervention actually happened before settlement terms had been disclosed. There was no disclosure of the settlement terms, and that was still deemed too late. And to the extent that the concern, Chief Judge Gregory, is from the plaintiffs, a concern about the fundamental fairness of the settlement, that's all what's taken up through the final fairness process. So if they had issues with the settlement terms, they had total opportunity to pursue that before Chief Judge Dever. If their concern was about the inherent fact that the Speaks case was ongoing, a settlement might be reached that would preclude them, they knew about that for years, and certainly for months before they tried to intervene. When did Lewis opt out in relation to the motion to intervene? October, Your Honor. So even under the Third Circuit's rule for Mr. Lewis, he's still months out of time. Even if he got the benefit of that, and I could argue about that, but there's no question that the appeal from intervention is not before the court. I will note one other point about that, Judge Guadalban, which is that if Mr. Lewis was content to make his arguments through objections coming from objectors, then there's no distinct issue with intervention. Because those arguments were made, the same arguments, from the same lawyers, and so this is really a moot issue. There's just no way. The Third Circuit case had someone who had not opted out. Correct, Your Honor, correct. And I do want to also address this question of whether there was adequacy of representation. And I would note, for Your Honors, the arguments that Mr. Runyon is making about inadequacy are very dangerous arguments. I would not think that a plaintiff's class action lawyer would want to make those arguments because those are a recipe for mischief and a way to defeat class actions, to defeat class certification. There was no argument below, I agree with Mr. Shipman, about a subclass, an exclusion of Fisher-Lewis. There's no way to do that, Your Honors, because these are overlapping classes. Everyone recognizes. A settlement in the one is going to resolve the other. That's just how it is with these massive overlapping classes. And as to what the record and theory was in the state court, I would respectfully point Your Honors to the Joint Appendix 2468 and at 457, where you can see how Mr. Runyon's Fisher-Lewis class was certified. To quote the operative class-wide theory that was urged by appellant's counsel and accepted by the North Carolina courts, quote, the central issue common to all plaintiffs is whether they are entitled to share in the accumulated assets held by defendant, which defendant contends is held as a reasonable reserve, period and close quote. Precisely right, Your Honors. That is the Fisher-Lewis theory for liability. That is the Speaks theory for liability. And it only makes sense when you have class members who share in this cooperative whose blood, sweat, and tears went into the reserve that was accumulated, how these funds were invested, what the federal government was doing for all tobacco farmers over a period of decades. They should all be able to share in any regard. Sometimes when they're years of loss, the contributions that made the losses less have some impact on the amount of the reserves. I think that is true, Judge Quattlebaum, but it's also why the federal government was offering some generosity to this cooperative and to tobacco growers by basically saying because all of you are in this business together, you will all get the benefit of what the cooperative is able to do now and going forward. Now, I want to emphasize, we don't think any of that money is due to be distributed. We think all that property belongs in the reserve for the benefit of current and future tobacco growers. This is not some bloodless corporation. This is the only way that growers of tobacco today and tomorrow can continue to make a living now without the benefit of federal price supports. But to the extent we confront theories that say there's some excess in the reserve that should be paid out, your honors, it only makes sense. It only makes sense that all growers are going to share in that recovery just as all growers were working and contributing to the cooperative. And certainly, there's no abuse of discretion. You may be wrong, the other side may be wrong, but the district court judge considered those arguments. Is that correct? That is absolutely true. But I would also note that the plaintiff's expert, Dr. Harrison, when he testified years ago in connection with the state court-proposed settlement, he advocated that all class members be able to share. He was concerned about some being excluded from recovery. And of course, I think it only makes sense, Judge Potomac, because these monies are being invested. It's not like tobacco each year is contributing to that reserve's accumulation. It's the federal government that gives seeded tobacco to the cooperative combined with investments. And if you instead look at it from a patronage perspective, those claims, your honors, were time-barred decades ago. Decades ago. And they don't connect to the federal distribution that happened in 2004, which was based on no net cost assessments that were paid like taxes. And if the theory of recovery is that everyone who paid no net cost assessments deserves to share in the recovery, well, importers and manufacturers of tobacco, they would have to be coming into this class or getting some portion of it. Again, it's less money that goes to class members. I want to address, if I may, your honors, the collusion argument, which we take extremely seriously. I mean, my client does, my colleagues and myself, everyone associated with our team. Chief Judge Dever found specifically that this settlement was reached as a result of good faith bargaining at arm's length without collusion. That's at Joint Appendix 4763. You can also see his further analysis at Joint Appendix 4743, 4744, 4764, 465. There's no argument from appellants that that was clear error and that there's any basis to reverse it. Judge Bullock presided over the mediation and signed a term sheet attesting that this was the product of arm's length. Who had not, didn't have benefit of the state court ruling at the time? Temporally, he didn't, Judge Thacker, because that came after. He did have the benefit of letters that were exchanged between Mr. Sherry for the Fisher Lewis class and Mr. Shipman, and those were specifically provided to him in connection with the mediation. They were the first thing that Judge Bullock addressed in connection with the mediation to make sure that there was nothing improper, nothing unethical that was happening. The record also reflects prompt conscientious disclosure to all counsel and courts of the party's mediation process and plans to seek approval. You can find that among other places at Joint Appendix 4582. There was no evidence, Your Honor. Here we are with a full record. They had everything from the state court, Judge Thacker. They had full comprehensive discovery. It seems like the district court felt like somehow the mediator was being accused of collusion when the mediator really didn't have the information in front of him. I think there were some traces of that, frankly. In state court briefing that Chief Judge Dever was aware of. But I think that Chief Judge Dever's analysis went well beyond just Judge Bullock's role. Of course, fundamentally, Chief Judge Dever was looking for the proof that's in the pudding. Is this a good deal for class members? Let's look at whether this is a good deal or a bad deal or an OK deal relative to the merits. And what he found is that the actual merits, when you drill down on them for the Fisher Lewis class or for the Speaks class, this is a generous settlement by comparison. Certainly, it is fair. It is reasonable and is adequate. And that's page after page after page of it. By comparison to what? By comparison to the likely outcome of continued litigation. How does this record show that the district court was really aware of the merits in that sense? This matter was stayed for what, about five years? And then it looked like it went from absolutely stayed to fast track. Here's the settlement. Well, Your Honor, I think that that often happens after class certification. That can be galvanized. That may be where we are, but that may be also something we consider in terms of whether or not there was an appropriate consideration or was fair and reasonable without understanding the nuance of the typicality and the interest of the party. Often you say, well, for the cooperative, they want to keep all of this part of gold for now and the future. But the members may have a different interest in it. Why isn't that nuance important before you get to how you have adequately determined fair and reasonableness of the settlement? That's the question. Your Honor, I think all those questions are important, Chief Judge Gregory. Well, thank you. I appreciate it. Now, answer them. Okay, but I think Chief Judge never treated them as important. I think he did analyze the way, the only way you can analyze, because this court has said you're not going to have a full trial at the time that you approve a class action settlement. So you're looking at the available data points. And for that, I think you can find lengthy analysis from Chief Judge Dever. It's on pages 47, 49, I think, to 47, 60 or 47, 61 of the joint appendix where he analyzes the problems, the legal problems, most of them, that the speaks class would confront. Then specifically for the Fisher-Lewis class in state court, he goes through the Fisher-Lewis theories and explains why those are no better. They may even be worse. It's a joint appendix 47, 68 and 73. So I think that's important, Judge Thacker, to how he's looking at, was there something collusive? Was this not arm's length? He also has the portions that he does about Judge Bullock's role. And he also, as you pointed out, Judge Quattlebaum, specifically addresses any concerns about the notices. In footnote 32, he specifically disagrees with the state court that there was any issue with the notices. It's really the notices that are the basis for the findings of impropriety and supposed violations of professional ethics. You hadn't, in their discussion, aside from the merits of the financial condition of the co-op, in terms of, particularly when compared to a $70 million offer before, I mean, I think there's a couple of pages where he looks at that in terms of what's a reasonable likelihood in the outcome. Based on sworn testimony, based on sworn testimony, there was no claim by the experts for the Fisher-Lewis class or anyone else that those numbers were wrong. That there was anything unreasonable in the reserve. There was no effort to depose any of those individuals. And in fact, the deposition of Dr. Harrison, we submit, revealed that this is a fundamentally flawed case on the merits and a good settlement by comparison for class members. And one last point, I know I'm well over my time, I would just emphasize, Chief Judge Gregory, that to get class members money, which to the extent that there's going to be a resolution here that involves the co-op paying out money, they want that money to go to class members. And the fastest, the surest, the most efficient way to get that money to class members, I mean, the growers of tobacco, is through a settlement. The money does not go to the lawyers. It's not going to basically be resulting in some relatively large percentage of attorney's fees. Here, the attorney's fees are well less than 10%, and the money's ready to be paid pending this court's decision. And that's what I think the parties at this point, the parties to this case, would respectfully ask this court to facilitate by entering an affirmance. If there are no further questions, I appreciate the court's indulgence, and I will subside. Thank you, Mr. Schaffer. Thank you. Mr. Runyon. It would be a good deal for the co-op. Of course, it is a good deal. Definitionally, they arrived at a settlement. The problem here is, is it doesn't adequately represent the entire class. And whether they didn't intervene on a timely basis or not, the issue is still here about the adequacy of representation of a subset of this broad class that is unrepresented. And the best example of that is the 44-page order of the state court judge with concurrent jurisdiction of this case. The court went through the record for the Lewis case from the beginning until that moment, looking at the issues of the $78 million settlement, the five to six times speak settlement in mediation that occurred, all before certification. Certification is what gives a class its muscle. This was before it had any muscle and all of a sudden it's now weaker. This was clearly an attempt by the cooperative to limit its exposure by taking a weaker case legally on weaker theories and getting it to preclude a stronger case and the fact that the district court considered, but didn't consider, I would argue, the state court order is significant. Mr. Runyon, you know, obviously you can argue the case if you want, but you don't rebuttal, but if you would, just in simple terms, because I think the other side has made it clear that position is, listen, this $24 million is ready to go, legal fees are reasonable, out the door, it's fine. Tell us why and what does it mean for your clients that this is wrong, that it could get more money and or there's a question of fact on merits that is premature in your, you see what I'm saying, in terms of, because they got theirs in dollars and cents, can you give that in the sense of a dollar or cents, what they are losing, because you can't forecast everything in the future, but what you purport to be the merits of the muscle that this makes this settlement puny or inappropriate, because that's where we're about. Forget about the intervention. Court has a still an independent obligation, whether you intervene or not, that is reasonable and fair. Tell us that. There are $4 million that were supposed to be paid back to the people who memberships were terminated. That was never done. That's a fact. There's $23 million in certificates that have already been applied to the interest of specific members that were never paid back. That's never been done. There's $110 million that was used to buy tobacco back and then put the money into reserve. That's never been paid back. And there's another $85 to $90 million that was produced and put in a separate segregated pot for the tobacco that came back as a result of the termination of the Fair and Equitable Tobacco Act. And the issue, Your Honor, is they have taken this concept of reserve and they brought it to present day. Well, of course, they can justify the 100% of the reserve. There wasn't an adversary proceeding on that. They went in there without ability to do that. In our case, the question of the reserve should be looked at from one point in time, and that is when our class ended. Our class didn't end in 2018, as they did. They ended in 2004. In 2004 is when they terminated 99.99% of the memberships in this co-op. 800,000 people were terminated and were not allowed to continue to have an interest in the reserves. Reserves that their efforts created. That's what's happening here. The 800 plus people since then, they claim have a right to the rest of the reserves. But Mr. Rennie, assuming that's true, and I appreciate that argument, actually, didn't the district court look at that fact, and in particular, the legal hurdles associated with that fact? Because it seems like the strength of that argument almost, on the other hand, gives rise to the strength of the statute of limitation defense. So if it's so clear that things ended in 2004 and that gave your client these rights, and again, I'm not sure you probably have good responses on the statute of limitations. I mean, you're a fine lawyer. I'm sure you do, but I mean, that was part of the analysis, I think, that the judge considered. The problem the judge considered is he considered the analysis with respect to speaks and applied it to Lewis. Lewis brought its claim within two months of this notice of termination in 2005. There's no statute of limitations problem there. They weren't saying that they couldn't have kept it up to that time. They're saying that when you took 800,000 people away from this case, away from this membership, and you changed the reserve from 427 per person to 350,000 per person, that's when the claim arose. That's when the issue began. They waited seven years to file and they needed equitable tolling to get that and plant it and don't have it because of the Agrachem case, because equitable tolling doesn't apply here for them. So they've got the statute problem. No question about that. That's another reason it shouldn't have been certified because their claims are subject to statute of limitations and Lewis are not. In the end, there are 800,000 growers here who have been deprived of their rights. That's just the bottom line. Thank you. Thank you.
judges: Roger L. Gregory, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.